GEORGE AND LAURA CHRISTIAN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Christian v. Commissioner
Docket Nos. 23453-86, 35390-87, 36499-87
United States Tax Court
T.C. Memo 1994-332; 1994 Tax Ct. Memo LEXIS 366; 68 T.C.M. (CCH) 129; July 21, 1994, Filed *366 Decisions will be entered under Rule 155. George Christian and Laura Christian, pro se in docket No. 23453-86. George Christian, Jr., and Marion E. Christian, pro se in docket No. 35390-87. Clyde A. M. Miles, pro se in docket No. 36499-87. For respondent: Pamela S. Wilson, Rajiv Madan, and Arnold J. Gould. DAWSON
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: These cases were assigned to Chief Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [2] The Court agrees with and adopts the opinion of the Chief Special Trial Judge which is set forth below. OPINION OF THE CHIEF SPECIAL TRIAL JUDGE PANUTHOS, Chief Special Trial Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Docket
Sec.
Sec.
No.
Petitioners
Year
Deficiency
6659
6661
23453-86 [1]
George Christian
1979
$  2,818.96
*[2]
--
and
1980
1,565.78
*[2]
--
Laura Christian
1982
3,301.00
*[2]
--
35390-87
George Christian,
1979
9,844.00
$ 2,953
--
Jr., and Marion E.
1980
9,212.00
2,764
--
Christian
1982
15,008.00
2,533
$ 1,641
36499-87
Clyde A. Miles
1979
6,977.00
2,093
--
1980
8,057.00
2,417
--
1981
10,618.00
2,710
--
1982
9,263.00
2,779
2,316
*367 Additions to Tax
Docket
Sec. Sec.
Sec.
Sec. No.
6653(a)
6653(a)(1)
6653(a)(2)
6621(c)
23453-86 [1]
--
--
--
*[3]
--
--
--
*[3]
--
--
--
*[3]
35390-87
$ 492
--
--
[3]
461
--
--
[3]
--
$ 750
50% of the interest [3]
due on $ 15,008 36499-87
349
--
--
[3]
403
--
--
[3]
--
452
50% of the interest [3]
due on $ 9,032
--
463
50% of the interest [3]
due on $ 9,263
The issues for decision are: 1. Whether petitioners are entitled to losses and credits claimed with respect to purported investments in master recording lease transactions; *368 2. whether petitioners are liable for additions to tax for negligence, valuation overstatement, and substantial understatement; and 3. whether petitioners are liable for increased interest under section 6621(c). Additional issues raised by various petitioners are as follows:
4. Whether there was an improper reopening or second examination with respect to the examination of one of the partnerships involved; 5. whether petitioners were improperly denied an Appeals Office conference and, if so, the effect of such denial; and 6. whether the statute of limitations bars the assessment and collection of deficiencies with respect to the 1979 or 1980 tax liabilities of George Christian, Jr., and Marion E. Christian. Procedural Background
These consolidated cases have a long and tortured history. While we will not attempt to detail the entire procedural history of these cases, we provide some general background information. The cases were set for trial for June 22, 1993, by order of the Court dated February 26, 1993. By order dated April 29, 1993, the cases were continued for trial to September 20, 1993. Attached to the order setting each case for trial was a Standing *369 Pre-trial Order (SPTO). The SPTO required among other things that the parties: (1) Communicate and attempt to stipulate all facts and documents not in dispute; (2) exchange documents with the opposing party in advance of trial; (3) prepare and serve a pre-trial memorandum on the opposing party and the Court 15 days prior to trial (a sample form of a pre-trial memorandum was attached to the SPTO). The SPTO also informed the parties that sanctions could be imposed for failure to comply with the SPTO. Respondent essentially complied with the requirements of the SPTO. George Christian, Jr., alleged that he did not receive the SPTO. [3] The records of the Court reflect that the SPTO was served on all parties in these cases. Despite petitioners' failure to comply with the SPTO, the Court, in its discretion, permitted petitioners to proceed to trial. As a result of petitioners' failure to comply with the SPTO, much time was consumed in attempting to arrive at an agreed stipulation of facts. It was not until the late afternoon of the third day of trial that the process of offering approximately 150 documents for stipulation was completed. The Court painstakingly considered separate *370 objections relating to the proposed exhibits and ruled on the admissibility of many said documents. At the conclusion of the trial, the Court, in accord with its Rules, ordered that briefs be filed. Petitioners made a plea to the Court that, as pro se petitioners, they would prefer that no briefs be filed. The Court, while ordering that briefs be filed in the usual manner, clearly indicated that the failure of petitioners to file a brief or strictly comply with the required format of a brief would not be held against them. After petitioners received copies of the typewritten transcript of the trial, they alleged that there were substantial "gross errors" in the transcript. The Court provided a procedure wherein all parties could listen to the original audio tapes (in the custody of the Court) and compare same with the typewritten transcript. Petitioners again renewed *371 previously denied motions seeking custody of the original audio tapes. Petitioners effectively refused the invitation of the Court to compare the typewritten transcript with the original audio tapes. As a result of the delay occasioned by the continuing allegations of petitioners concerning the accuracy of the transcript and petitioners' unwillingness to accept the method provided by the Court to resolve the dispute, the Court ordered that no briefs be filed by any of the parties. The Court has thus proceeded to render this opinion without the benefit of briefs from any of the parties. Petitioners have continued with additional post-trial motions, including a mandamus action in the Court of Appeals for the Fourth Circuit (In Re: Christian, No. 94-1433, filed Apr. 13, 1994). [4]
*372 FINDINGS OF FACT At the time of the filing of the petitions herein, petitioners George Christian and Laura Christian (docket No. 23453-86) resided in Baltimore, Maryland; petitioners George Christian, Jr., and Marion E. Christian (docket No. 35390-87) resided in Columbia, Maryland; and petitioner Clyde A. Miles (docket No. 36499-87) resided in Temple Hills, Maryland. Audio Leasing
Audio Leasing Corp. [4] (hereinafter ALC) was a New Hampshire corporation established in 1980 which claimed to provide financing for the music, entertainment, and communications industry by acquiring audio masters and communications masters for lease. An audio master (master) is a tape or other medium upon which a specific performance or program has been electronically recorded, and from which copies of the performance or program can be made for commercial use. If the master is multitrack, it is generally mixed and balanced and then made available for commercial use. In the instant cases, the masters in issue were recorded onto audio cassette tapes for purposes of distribution. *373 Generally, ALC would acquire a master from a seller. ALC would lease to investors the rights to distribute copies of the master for a period of 7-1/2 years. At the end of the lease period, all rights in the master reverted back to ALC. In the promotional material offered by ALC, there is some discussion concerning opportunities and markets for potential distribution of a master recording. There is also a discussion concerning the economics of the investment. In addition, there is discussion concerning the tax incentives associated with such investment. This discussion includes two legal tax opinions and a full-page chart. According to the chart, a lessee would receive tax benefits in excess of the amount of cash paid. The promotional material indicates that investors were eligible for an investment tax credit (ITC) based upon the purchase price of the master recording. In addition, the material indicates that investors could claim a deduction for expenses associated with their investment, including lease payments and distribution costs. On or about December 31, 1982, ALC purportedly purchased a master recording of the music artist Bob Marley titled "Wings of a Dove". The *374 purchase price of the master recording was purportedly $ 550,000. A representative of ALC signed a promissory note in the amount of $ 544,900, payable in 1994. The only payment obligation on the note prior to 1994 was to occur if ALC received as rent a share of the gross receipts from the sale of the tapes. The note was titled "recourse promissory note" and refers to a certain purchase agreement between the buyer (ALC) and seller and a corresponding security agreement. A discussion of the purchase agreement, as found in the promotional material, indicates that payment on the promissory note is secured by a first security interest in the master recording, and the credit of ALC. On or about December 17, 1982, ALC purportedly purchased a master recording of various artists titled "Guitar Greats". The purchase price of the recording was purportedly $ 335,000. A representative of ALC signed a promissory note in the amount of $ 330,400 also payable in 1994. The note, bearing the same notation, "recourse promissory note", contained the same provisions as that involving the Bob Marley recording, including reference to a purchase agreement. There is no specific documentation which *375 explains how ALC and the sellers arrived at the purchase price of both the master recordings. For example, there is no evidence which establishes the cost incurred by the sellers to acquire the master recordings. The offering material indicates that the value of the master recording is independently determined by industry experts experienced in product acquisition and market expectations. Respondent presented as her expert witness Thomas Bonnetti (Bonnetti). Bonnetti performed an appraisal of the commercially distributed copy of the Bob Marley "Wings of a Dove" master. Bonnetti also performed an appraisal of "Guitar Greats". Bonnetti did not appraise a commercial copy of the "Guitar Greats" master recording but instead appraised what appears to be a copy of the commercially distributed product. A copy of the commercially marketable tape was not received into evidence. According to Bonnetti, the fair market value of both of the master recordings was significantly less than the purchase price purportedly paid for them. Georgetowne Sound
On December 9, 1982, George Christian, Jr., and Clyde A. Miles formed a partnership known as Georgetowne Sound (GS). According to the *376 terms of the partnership, each partner shared equally in all profits, losses, and expenses of the partnership. [5]
On December 9, 1982, GS signed an equipment lease with ALC. According to the terms of the lease, GS purchased the rights to distribute copies of the master recording Bob Marley's "Wings of a Dove" for 7-1/2 years. The lease prohibited GS and its partners from altering the master in any way, unless permission was granted by ALC. The promotional material explaining the conflict of interest that may have arisen in this leasing indicates that ALC would lease master recordings of the same artist to other investors. *377 In exchange for the rights to distribute copies of the master recording, GS was obligated to make payment of $ 30,000 and 50 percent of net revenue received by GS from revenue-producing ventures involving the master recording, payable every 6 months. GS was obligated to pay 80 percent of the $ 30,000 in the first year, with the remaining 20 percent amortized over 6-1/2 years and payable on a semiannual basis. A form indicating ALC's intention to pass through the ITC to GS was attached to the copy of the lease in the record. On December 27, 1982, GS entered into a distribution agreement with NEO Records (NEO). NEO was hired to manufacture and distribute copies of the Bob Marley "Wings of a Dove" master recording. GS was to pay NEO $ 7,500 plus 60 percent of gross receipts from sales and 50 percent of any public performance fees received by GS with respect to the master recording. NEO was one of the record labels financed by ALC itself for purposes of distribution. NEO was mentioned in an audio journal distributed by a parent company of ALC and received by petitioners. GS used NEO's services for approximately 2 years and then attempted to distribute the tapes itself. At the *378 time of the investment, George Christian, Jr., was an electronic journalist with Columbia Broadcasting System (CBS) News, with several years of work experience in this field. Clyde A. Miles was an associate director with CBS News. Neither petitioner had any experience in the music master recording business. They learned of ALC through Ed Astri (Astri), a promoter of the ALC investment plan. George Christian, Jr., and his father, George Christian, attended seminars at which Astri explained the investment opportunities available in music master recordings. Clyde A. Miles in turn learned of the investment from George Christian, Jr. Petitioners did not seek an independent appraisal of the master recording before entering into the lease. They relied upon a purported appraisal done by Richard Gilbert (Gilbert) at the behest of ALC, which valued the Bob Marley "Wings of a Dove" master recording at over $ 600,000. Gilbert did not testify at the trial. There is also no indication that petitioners sought advice from an independent financial advisor, accountant, or attorney concerning the economic viability of the plan. On Form 1065, U.S. Partnership Return of Income, filed for the *379 taxable year 1982, GS claimed total deductions in the amount of $ 31,552, comprised of lease payments in the amount of $ 24,000 and production expenses and office supplies in the amount of $ 7,552. GS reported no gross sales or receipts from the master recording. George Christian, Jr., and Marion E. Christian
On the Schedule E attached to their original 1982 Federal income tax return, George Christian, Jr., and Marion E. Christian claimed a loss associated with GS in the amount of $ 15,776. On a Form 3468 attached to their return, they also claimed an ITC from their investment in the amount of $ 27,500 and used a portion of the ITC to offset taxes in 1982, carrying back a portion of the ITC to the taxable years 1979 and 1980. As a result of the carryback, these petitioners filed an application for tentative refund in the amounts of $ 9,844 and $ 9,212 for the taxable years 1979 and 1980, respectively. [6]
*380 George Christian, Jr., and Marion E. Christian filed their 1982 Federal income tax return on or before April 15, 1983. Prior to the expiration of the period within which to assess a deficiency for that year, these petitioners executed a Form 872-A, Special Consent to Extend the Time To Assess Tax. On July 3, 1987, these petitioners executed a Form 872-T, Notice of Termination of Special Consent to Assess Tax. Respondent mailed a notice of deficiency to these petitioners on August 5, 1987. Clyde A. Miles
On the Schedule E attached to his 1982 Federal income tax return, Clyde A. Miles claimed a loss associated with GS in the amount of $ 15,776. On a Form 3468, he claimed an ITC in the amount of $ 27,500, using a portion of the ITC to offset his taxes for the 1982 taxable year, and carrying back the remaining portion of the ITC to the years 1979, 1980, and 1981. Clyde A. Miles filed an application for tentative refund in the amounts of $ 7,020, $ 8,038, and $ 9,032 for the years 1979, 1980, and 1981, respectively. [7]
*381 Clyde A. Miles filed his 1982 Federal income tax return on or before April 15, 1983. Petitioner executed a Form 872-A prior to the expiration of the period within which to assess a deficiency for the year 1982. Clyde A. Miles executed a Form 872-T on July 18, 1987. Respondent mailed a notice of deficiency to him on August 27, 1987. [8]
Christian-Hall Associates
On December 6, 1982, George Christian and Laura Christian formed the Christian-Hall Associates partnership (CH) with six *382 other partners. These petitioners possessed a proportionate interest in the profits, losses, and expenses of the partnership. On December 6, 1982, CH entered into an agreement with ALC to lease the "Guitar Greats" master recording. The terms of the lease, including the payment schedule, are identical to those found in the GS lease except that the lease payment for "Guitar Greats" is $ 20,000 rather than $ 30,000. [9]
CH enlisted NEO's services to distribute the "Guitar Greats" tapes. [10] After a period of approximately 2 years, CH ceased using NEO as a distributor and hired GS instead. As of the date of trial, GS has been unsuccessful in distributing the "Guitar Greats" tapes. *383 At the time of this investment, George Christian was unemployed as a result of disability. Prior to his disability, George Christian was employed as a mail carrier. He and his wife, Laura Christian, had no experience in the music master recording business. They learned of the investment possibilities offered by ALC through its promoter, Astri. These petitioners did not obtain an independent appraisal of the value of the master recording. They relied upon an appraisal purportedly done by Gilbert at the behest of ALC, which valued the "Guitar Greats" master recording at $ 750,000. They also did not obtain the assistance of an independent advisor to assess the economic viability of the investment. On Form 1065 filed for the taxable year 1982, CH claimed total deductions in the amount of $ 16,000 and a loss in the amount of $ 21,000. [11]
On their original 1982 Federal income tax return, [12] George Christian and Laura Christian claimed a partnership *384 loss associated with CH in the amount of $ 4,200. [13] In addition, on Form 3468 these petitioners claimed an ITC in the amount of $ 33,500. They used a portion of the ITC to offset taxes in 1982, carried back a portion to 1979 and 1980, and carried forward a portion to 1983 and 1984. As a result of the carryback, George Christian and Laura Christian filed an application for a tentative refund in the amounts of $ 2,818.96 and $ 1,565.78 for the years 1979 and 1980, respectively. Petitioners in all of the above docketed cases claim that they should be entitled to the deductions and credits associated with their respective investments in the music master recordings. According to petitioners, they entered into the master recording industry with the *385 intent to make a profit and with the belief that the master recordings in issue were economically viable. George Christian, Jr., and Marion E. Christian claim that respondent is barred by the statute of limitations from assessing and collecting deficiencies for their taxable years 1979 and 1980. Respondent claims that the arrangements entered into by GS and CH with ALC with respect to the Bob Marley and "Guitar Greats" master recordings lacked economic substance and, therefore, petitioners are not entitled to claim any deductions or credits associated with their investment. [14] Furthermore, respondent claims that the statute of limitations does not bar proceeding against the deficiencies determined for the taxable years 1979 and 1980. Internal Revenue Service Examination and Appeals
On August 16, 1983, GS's 1982 partnership tax returns were referred to a District Director of the *386 Internal Revenue Service (IRS) in Baltimore. [15] On September 21, 1983, GS's returns were sent back to the IRS Federal Records Center in Philadelphia, Pennsylvania. During this time IRS agents did not request petitioners to provide any books or records with respect to GS. On August 23, 1984, GS's 1982 returns were referred back to the District Director in Baltimore, at which time the IRS examination support section in Baltimore undertook an examination of GS's 1982 returns. On June 2, 1986, the examination was closed. On August 5, 1986, George Christian, Jr., and Marion E. Christian filed a letter with the IRS protesting the proposed tax adjustments and requesting a conference with the Appeals Office of the IRS. Respondent presented these petitioners with a settlement offer which reflected a uniform position adopted by respondent concerning issues such as those raised in these petitioners' case. This settlement offer was apparently *387 rejected by these petitioners. OPINION Procedural Issues
Before proceeding with a discussion concerning petitioners' investment activities, we discuss several procedural issues raised by some petitioners. George Christian, Jr., and Marion E. Christian claim that GS's 1982 partnership return was improperly examined twice and, therefore, the notice of deficiency issued for the 1982 taxable year was invalid. These petitioners refer to section 601.105, Statement of Procedural Rules, in support of their argument. Their reliance on section 601.105, Statement of Procedural Rules, is misplaced. Section 601.105, Statement of Procedural Rules, refers to the reopening of a case which was closed after an "examination". [16] There is no indication that GS's 1982 partnership returns were "examined" as intended in these regulations prior to August 23, 1984. Prior to August 23, 1984, neither of these petitioners nor any other person associated with GS was asked to provide the IRS with GS's books or records. These petitioners did not present any evidence indicating that they met with an IRS examination agent or that they received a copy of the examiner's purported findings. Sec. 601.105(c), *388 Statement of Procedural Rules. The documentation relied upon by these petitioners does not indicate that an examination was performed on GS's 1982 returns prior to 1984. Finally, the testimony provided by the IRS agent responsible for the examination of the return satisfies us that the GS returns were not previously examined. In any event, the directives set forth in the aforementioned statement of procedural *389 rules are discretionary and not mandatory. The failure to follow these procedures does not impinge on the power of the Commissioner to issue a valid statutory notice of deficiency. Pleasanton Gravel Co. v. Commissioner, 64 T.C. 510, 529 (1975), affd. per curiam 578 F.2d 827 (9th Cir. 1978); Collins v. Commissioner, 61 T.C. 693, 701 (1974); Allison v. Commissioner, T.C. Memo. 1993-35 (even if there was a violation of the procedural rules, such a violation would not affect the validity of the notices of deficiency because such rules are merely directory). Based upon the foregoing, we find these petitioners' argument to be without merit. George Christian, Jr., and Marion E. Christian raised a second procedural objection. They claim that they were denied their "constitutional right" to an Appeals conference. Section 601.103(c)(1), Statement of Procedural Rules, provides that a taxpayer should be given an opportunity to request that the Commissioner's Appeals Office consider the taxpayer's case. Section 601.106, Statement of Procedural Rules, explains in detail *390 the Appeals process. From the record, it does not appear that these petitioners were denied an Appeals conference. Rather, the unified position established by respondent with respect to this investment appears to have been her position in the Appeals process, which these petitioners refused to accept. However, assuming arguendo that respondent did deny these petitioners the right to an Appeals conference, they are incorrect in their belief that they have a "constitutional right" to an Appeals conference. It is established that the Commissioner's failure to provide an Appeals conference does not violate a taxpayer's right to due process. Riland v. Commissioner, 79 T.C. 185, 202 (1982); Cupp v. Commissioner, 65 T.C. 68, 83 (1975), affd. without published opinion 559 F.2d 1207 (3d Cir. 1977); Cataldo v. Commissioner, 60 T.C. 522, 523 (1973), affd. per curiam 499 F.2d 550 (2d Cir. 1974); Wisniewski v. Commissioner, T.C. Memo. 1989-60. The final procedural argument raised by George Christian, Jr., and Marion *391 E. Christian concerns the deficiencies determined for the taxable years 1979 and 1980. These petitioners maintain that the period of limitations expired with respect to those years; therefore, respondent is barred from making any assessment. These petitioners bear the burden of proving this affirmative defense. Adler v. Commissioner, 85 T.C. 535, 540 (1985). Section 6501(a) provides generally that in the absence of certain circumstances, the Commissioner has 3 years from the date a return was filed, or if later, the date that it was due, to assess a tax for that particular year. Sec. 6501(a). Assuming the returns were filed on April 15 of the succeeding year, [18] the 3-year period for assessment of a deficiency for taxable years 1979 and 1980 would have expired on April 15, 1983, and April 15, 1984, respectively. Sec. 6072. The notice of deficiency was issued in 1987. However, section 6501(j)(1) provides, in part, that: In the case of a deficiency attributable to the [applications] * * * of a credit carryback * * * such deficiency may be assessed at any time before the expiration of the period within which a deficiency for the taxable year *392 of the unused credit which results in such carryback may be assessed, or with respect to any portion of a credit carryback from a taxable year attributable to * * * other credit carryback from a subsequent taxable year, at any time before the expiration of the period within which a deficiency for such subsequent taxable year may be assessed. [19]
In the instant cases, the unused portion of the ITC was generated in the taxable year 1982. The determinations made in the notice of deficiency for the taxable years 1979 and 1980 stem from these petitioners' use of the unused portion of the 1982 ITC in those years. *393 Respondent issued a timely notice of deficiency with respect to 1982 pursuant to section 6501(a), and we hold that respondent is not barred by the statute of limitations with respect to deficiencies asserted for the years 1979 and 1980. See Herman Bennett Co. v. Commissioner, 65 T.C. 506 (1975); Vest v. Commissioner, T.C. Memo. 1993-243. Substantive Issues
Respondent's primary argument is that petitioners are not entitled to the credits and deductions taken in connection with their respective investments in the master recordings. Respondent maintains that the transactions lacked economic substance and had no business purpose other than the creation of income tax losses and credits. The IRS may ignore for tax purposes a sham transaction. Hines v. United States, 912 F.2d 736, 739 (4th Cir. 1990). A sham transaction is one without economic substance designed to create tax benefits rather than to serve a legitimate business purpose. Id. (citing Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978)); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 195-196 (1983), *394 affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985). Petitioners bear the burden of proving entitlement to the claimed deductions and credits. Rule 142(a); Interstate Transit Lines v. Commissioner, 319 U.S. 590, 593 (1943); Hunt v. Commissioner, T.C. Memo. 1989-660, affd. 938 F.2d 466 (4th Cir. 1991). This Court and the Court of Appeals to which this case is appealable have applied a two-pronged test to determine whether a transaction is a sham. Hunt v. Commissioner, 938 F.2d at 471; Rice's Toyota World, Inc. v. Commissioner, supra.[19] In applying this test, the substance of a transaction rather than its form will control its tax consequences. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 196. *395 The first prong of the test (the subjective prong) is whether the taxpayer was motivated by a business purpose other than obtaining tax benefits in entering into the transaction. The second prong (the objective prong) is whether the transaction has economic substance. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 91. Whether under this test a particular transaction is considered a sham is an issue of fact. Id. at 92. The business purpose inquiry looks to the motive of the taxpayer in entering the transaction. In particular, we look to petitioners' motive for the respective partnerships' investments in the master recordings. To this, we look to the structure of the investments, drawing from the objective facts inferences regarding a subjective intent to profit. Hunt v. Commissioner, 938 F.2d at 472. We first focus on the promotional material. There is little emphasis placed upon the profit potential of a master recording and the means by which a profit could be achieved. Rather, the material explains in much greater detail the availability of tax benefits through both the *396 investment tax credit and the deductibility of lease payments and distribution costs. [20]
The evidence presented by petitioners concerning their research conducted prior to investment also fails to establish the requisite profit motive. None of petitioners possessed any experience in the field of music master recording. Although George Christian, Jr., was an experienced cameraman with CBS News, this certainly does not qualify him as possessing the requisite knowledge for the successful distribution of tapes produced from a master recording. George Christian, Jr., Marion E. Christian, and Clyde A. Miles claimed that they researched this activity and performed an informal investigation of the marketability of the particular master recording prior to investment. As proof, these petitioners presented various articles that they read, and testified that they performed an informal survey *397 with vendors in the United States and the Caribbean as to whether Bob Marley recordings were selling. We find that these petitioners' actions prior to investment were insufficient to establish a profit objective. For example, rather than rely on what undoubtedly would be an inexact survey regarding the demand for Bob Marley recordings, assuming that such a survey was undertaken, [21] these petitioners could have enlisted the assistance of an independent marketing agency which would be in a better position to forecast the demand for such recordings.
George Christian, Jr., claimed that he enlisted the services of an attorney in Washington, D.C., to assess the validity of ALC and the investment itself. He failed to present sufficient *398 evidence to establish that he actually sought such advice, and, if so, he failed to provide any evidence concerning the purported advice of counsel. Furthermore, George Christian, Jr., claimed he was advised by an accountant with respect to the investment. He again failed to produce any evidence with respect to the purported advice, including eliciting the testimony of the accountant. George Christian claimed that he relied upon the research purportedly performed by George Christian, Jr., with respect to ALC. We find that all petitioners have failed to adequately establish that they sought and actually obtained assistance from an independent person qualified to render advice on ALC and, in particular, investments in master recordings. Furthermore, we find the negotiations between petitioners and ALC prior to the investment to be incongruous with a profit motive. Petitioners did not acquire an independent appraisal of the Bob Marley master recording or the "Guitar Greats" master recording. Rather, petitioners relied upon appraisals purportedly done by Gilbert which were done at the behest of ALC. Reliance solely on an appraisal furnished by the seller of an investment may be *399 indicative of an indifference to economic profit. See Beck v. Commissioner, 85 T.C. 557, 572 (1985). There is also no reliable indication that petitioners negotiated the price and terms of their respective leases and their initial distribution agreements. [22] Furthermore, petitioners entered into the lease agreements several weeks before ALC signed the promissory notes to purchase the master recordings. Thus, at the time of the lease agreements, ALC had not even acquired the rights to the master recordings. With the exception of petitioners' self-serving testimony, there is nothing to contradict the evidence suggesting a lack of profit motive. Based upon the foregoing, we find that petitioners failed to establish that they possessed the requisite profit motive with respect to *400 their investment in the master recordings. The second prong of the test to determine whether a sham transaction exists is the economic substance inquiry. For this, we look to see whether, aside from the tax benefits, the lease program afforded petitioners no reasonable possibility for profit. One area of concern in a case such as this is whether the purchase price paid by ALC for each master recording bears a relationship to the fair market value of the recording. Respondent claimed that the fair market values of the master recordings were negligible. Petitioners failed to present any documentary evidence or expert testimony with respect to the fair market values of the recordings other than the appraisals prepared by Gilbert. As indicated earlier, the appraisals were prepared by Gilbert for ALC and not at the request of petitioners. We find the appraisals unreliable as evidence of the fair market value of the master recordings. In conjunction with the lack of an independent appraisal of the recordings is the fact that there was no indication that ALC and the sellers of the recordings engaged in arm's-length negotiations with respect to the purchase price. There was inadequate *401 evidence presented as to the cost incurred by the sellers to acquire the master recordings. The evidence relied upon by petitioners, namely promissory notes between ALC and third parties, appeared to make reference to the ownership history of the respective masters. We find this evidence to be unreliable. The documents were confusing and often omitted significant detail. Petitioners failed to present any additional evidence to clarify this issue. Furthermore, ALC signed the promissory notes to purchase the master recordings after entering into the leases with petitioners. The absence of arm's-length negotiations is a key indicator that a transaction lacks economic substance. Rose v. Commissioner, 88 T.C. 386, 416 (1987), affd. 868 F.2d 851 (6th Cir. 1989). Petitioners have failed to establish the fair market value of the recordings. We will not accept the purchase price of the masters as reflecting their fair market value and respondent is sustained in her determination that their value, is negligible. [23]
*402 The next area of concern is the manner in which the sale of the recordings was structured. A sale financed by deferred debt which, in substance or fact, is not likely to be paid is an indicium of lack of economic substance. Hunt v. Commissioner, T.C. Memo. 1989-660 (citing Rose v. Commissioner, supra at 419), affd. 938 F.2d 466 (4th Cir. 1991). For this we will focus on the substance rather than the form of the debt. Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. per curiam 841 F.2d 264 (9th Cir. 1988). The debt incurred for the purchase of the Bob Marley master recording and "Guitar Greats" was financed primarily by promissory notes. Each of the notes bears the term "recourse promissory note". (Emphasis added.) However, upon further review, it is apparent that the notes are only recourse in form and in substance are truly nonrecourse. ALC was not obligated to make payment on principal or interest for 12 years. The only security pledged by ALC was an interest in the master recording and the credit of ALC. There is no real financial obligation *403 which would deter ALC from abandoning the outstanding debt once the investment lost its attractiveness. These notes do not reflect an honest obligation for the repayment of debt, but rather appear to be a tool utilized to artificially inflate the price of the master recordings so as to increase the amount of ITC available in the hope of enticing investors. While petitioners were not directly involved in the structuring of this level of the financing, the nature of the financing played an integral part in the investment relationship between ALC and petitioners. The availability of ITC's was strongly emphasized by ALC, and the larger the "purchase price" of the master recording, the larger the amount of ITC which could be passed through to the investor. Finally, the terms of the lease agreement granted petitioners' partnerships nothing more than a nonexclusive right to distribute the songs contained on the master recordings. By preventing petitioners and their partnerships from altering the master recordings, ALC would have been able to present the same selection of songs contained on the master, to other investors. Potential investors were advised of this potential competition *404 in the promotional material. Taking this into account together with the value of the recording, which was not shown to be more than negligible, it is virtually impossible to envisage any profit potential accruing to petitioners from these investments. Based upon the foregoing analysis, we hold that petitioners' investments in the master recordings are devoid of economic substance and were entered into solely for the income tax benefits. On this basis, the investments are to be disregarded for Federal income tax purposes. Accordingly, petitioners are not entitled to any deductions or credits claimed in connection with such program. Additions to Tax
1. Negligence
An addition to tax equal to 5 percent is imposed if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations. Sec. 6653(a)(1).[24] In addition, section 6653(a)(2) imposes an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations. Negligence is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would *405 do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proof on this issue. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). Petitioners entered into these leasing transactions possessing no experience in the master music recording industry. George Christian, Jr., Marion E. Christian, and Clyde A. Miles performed a cursory survey of the industry, while George Christian and Laura Christian relied solely upon the outcome of the above-mentioned petitioners' research. However, George Christian, Jr., Marion E. Christian, and Clyde A. Miles failed to establish that they sought the assistance of an independent person who was qualified to investigate ALC and, in particular, to assess the economic viability of the investments at issue. Petitioners cannot shield themselves from liability by claiming that they relied upon *406 the purported financial advisor Astri. Under certain circumstances, reliance by a taxpayer on the advice of a competent advisor can be a defense to the additions to tax. See, e.g., United States v. Boyle, 469 U.S. 241, 250-251 (1985); Ewing v. Commissioner, 91 T.C. 396, 423 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir 1991). However, reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a fact to be considered. In the instant case, petitioners' reliance on Astri was misplaced. See Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). It must be established that the reliance was reasonable, in good faith, and based upon full disclosure. Ewing v. Commissioner, supra; Pritchett v. Commissioner, 63 T.C. 149, 174-175 (1974). Astri was a promoter of the ALC investment and this Court has long held that reliance on a promoter *407 may not be justified. See, e.g., Rybak v. Commissioner, 91 T.C. 524, 565 (1988); Freytag v. Commissioner, 89 T.C. at 887-889; Patin v. Commissioner, 88 T.C. 1086, 1130 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). Petitioners also failed to obtain the assistance of an independent appraiser with respect to the valuation of the particular master recordings. Rather, petitioners relied upon the appraisals purportedly done by Gilbert at the behest of ALC. The appraisals appear to be standard reports which are included in the promotional material offered by ALC. These facts demonstrate petitioners' failure to exercise the care of a reasonable and prudent person investing in this type of investment and in claiming the *408 credits and deductions. See Neely v. Commissioner, supra.Accordingly, the additions to tax under section 6653 are sustained. 2. Section 6659
Respondent determined in the notices of deficiency that for all of the years in issue, George Christian, Jr., Marion E. Christian, and Clyde A. Miles are liable for additions to tax for the overstatement on their returns of the value of the Bob Marley master recording. These petitioners bear the burden of proving respondent's determinations are erroneous. Rule 142(a). Respondent asserted in her answer that for all the years in issue, George Christian and Laura Christian are liable for the additions to tax for the overstatement of the value of the "Guitar Greats" master recording. Respondent bears the burden of proving these petitioners are liable because respondent first raised the issue in her answer. Rule 142(a); Achiro v. Commissioner, 77 T.C. 881, 890-891 (1981). [25]
*409 A graduated addition to tax is imposed on individuals whose underpayment of tax equals or exceeds $ 1,000 and is attributable to a valuation overstatement. A valuation overstatement exists if the value of any property claimed on a return is 150 percent or more of the amount determined to be the correct amount of such valuation. Sec. 6659(c)(1). If the valuation exceeds 250 percent of the correct valuation, then the addition to tax is equal to 30 percent of the underpayment, but only to the extent the underpayment is attributable to the valuation overstatement. Section 6659 does not apply to underpayments of tax which are not attributable to "valuation overstatements". Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). A significant portion of the underpayment was attributable to the disallowance of the ITC claimed by petitioners. Petitioners based their computation of the credit on the purported purchase price of the recordings. "Wings of a Dove" was purportedly purchased for $ 550,000, and "Guitar Greats" was purportedly purchased for $ 335,000. According to petitioners, the purchase price *410 was supposed to reflect the fair market value of the recording. However, when a transaction lacks economic substance and is to be disregarded for Federal income tax purposes, the correct basis of an item, the valuation of which was an integral part of respondent's determinations, is zero. Gilman v. Commissioner, 933 F.2d 143 (2d Cir. 1991), affg. T.C. Memo. 1990-205; Rybak v. Commissioner, supra at 566-567; Foys v. Commissioner, T.C. Memo. 1992-81. Based upon this conclusion, we find that a valuation overstatement exists with respect to the Bob Marley master recording and the "Guitar Greats" master recording in excess of 250 percent and, accordingly, sustain the section 6659 additions to tax as determined in the notices of deficiency. [26]
*411 3. Section 6661
Respondent determined that for the year 1982, George Christian, Jr., Marion E. Christian, and Clyde A. Miles are liable for the section 6661 addition to tax for substantial understatement of tax liability. Section 6661(a) provides for an addition to tax if there is a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). If a substantial understatement exists, the taxpayer is liable for an addition to tax equal to 25 percent of the underpayment attributable to the understatement. In general, if a taxpayer had substantial authority for his tax treatment of the item in question, or if the taxpayer adequately disclosed the tax treatment of the item on his return, then the taxpayer may escape liability for the addition to tax. Sec. 6661(b)(2)(B). However, if the item in question is attributable to a tax shelter, the disclosure exception will not apply and the substantial authority exception will apply only if there was substantial authority for the treatment of the item on the return and the taxpayer reasonably believed *412 that his treatment of the item was more likely than not the proper treatment. Sec. 6661(b)(2)(C)(i)(I) and (II); sec. 1.6661-5, Income Tax Regs. For this purpose, section 6661(b)(2)(C)(ii) defines a tax shelter as any partnership, entity, or other plan or arrangement, the principal purpose of which is the avoidance of Federal income tax. Petitioners bear the burden of proving that respondent's determinations are erroneous. Rule 142(a); Condor Intl., Inc. v. Commissioner, 98 T.C. 203, 226 (1992). Petitioners failed to present any meaningful argument with respect to the imposition of this addition to tax. [27] Therefore, to the extent that the understatements are greater than the threshold test of 10 percent of the required tax or $ 5,000, petitioners shall be held liable for the section 6661 addition to tax. According to the notices of *413 deficiency, the tax required to be shown on George Christian, Jr., and Marion E. Christian's 1982 tax return was $ 15,008. The amount shown on their return is zero. The amount required to be shown on Clyde A. Miles' 1982 tax return was $ 10,618. The amount shown on the return is zero. In both instances, the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Accordingly, we hold that petitioners George Christian, Jr., and Marion E. Christian are liable for the addition to tax for the substantial understatement of tax liability and sustain the addition to tax as determined in the notice of deficiency with respect to them. With respect to Clyde A. Miles, the addition to tax as determined in the notice of deficiency does not take into consideration that portion of the underpayment which is already subject to the section 6659 addition to tax. Sec. 6661(b)(3). This should be recomputed during the Rule 155 proceedings. Increased Interest
Respondent determined that the deficiencies for all of the years in issue are subject to the increased interest rate imposed under section 6621(c). Respondent raised the *414 section 6621(c) issue with respect to George Christian and Laura Christian in her answer; therefore, she bears the burden of proof with respect to those petitioners. Rule 142(a); Achiro v. Commissioner, supra.
Section 6621(c)(1) imposes an increased rate of interest when there is a "substantial underpayment attributable to tax motivated transactions". For purposes of section 6621(c), an underpayment exceeding $ 1,000 is substantial. The additional interest accrues after December 31, 1984, even if the transaction was entered into prior to the enactment of section 6621(c). Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Congress specifically amended section 6621(c)(3)(A) in the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2740, to add to the list of tax-motivated transactions "any sham or fraudulent transaction". Sec. 6621(c)(3)(A)(v). This Court has interpreted section 6621(c)(3)(A)(v) to include transactions without economic substance. Patin v. Commissioner, 88 T.C. at 1129. *415 The underpayment of tax for all the years in issue exceeds $ 1,000; therefore, for purposes of section 6621(c) it is substantial. We concluded that all of the transactions in issue lacked economic substance, constituting shams. Therefore, they are tax motivated for purposes of this section. We find respondent has met her burden of proof. Accordingly, increased interest will be imposed under section 6621(c) for all the years in issue to the extent the underpayments are attributable to such tax-motivated transactions. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. The following cases are consolidated herewith: George and Marion E. Christian, Jr., docket No. 35390-87, and Clyde A. Miles, docket No. 36499-87. Initially, Carl Christian, docket No. 23454-86, was consolidated herewith; however, it was severed and dismissed when petitioner Carl Christian failed to appear for trail or otherwise respond to pretrial orders.↩
2. All section references are due to the Internal Revenue Code in effect for the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. The notice of deficiency in this docket included the 1983 and 1984 tax years. By order dated Feb. 17, 1988, said years were dismissed for lack of jurisdiction on the basis that such years were subject to the TEFRA partnership provisions.↩
*. This determination was asserted in respondent's answer.↩
2. 30 percent of the portion of the underpayment which is attributable to the valuation overstatement.↩
3. 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.↩
3. This was not the first time nor the last time that petitioner George Christian, Jr., alleged that the reason for his failure to comply with an order or instruction from the Court was that he failed to receive a communication.↩
4. In an unpublished per curiam opinion dated July 15, 1994, the Court of Appeals for the Fourth Circuit held that mandamus relief was inappropriate and that George Christian, Jr., was, in any event, provided an opportunity to review the tapes.↩
4. Audio Leasing Corp., a subsidiary of Audio International Productions, Ltd., changed its name in 1984 to Auravision.↩
5. George Christian, Jr., and Marion E. Christian claimed that GS made an election under sec. 6231(a)(1)(B)(ii) to be covered under the TEFRA proceedings. However, this Court concluded that no such election was filed by GS. Christian v. Commissioner, T.C. Memo. 1990-229↩. Therefore, for the taxable year 1982, GS is not a partnership covered under the TEFRA procedures.
6. George Christian, Jr., and Marion E. Christian filed an amended 1982 return on or about Mar. 8, 1984, which reflected a deduction in the amount of $ 2,250 for a spousal IRA contribution. Respondent did not appear to contest this deduction at trial; therefore, we deem it conceded. As a result, the amount of ITC available for carryback or carryforward was increased.↩
7. The amount of ITC utilized by Clyde A. Miles to offset his taxes exceeded the amount of ITC claimed on Form 3468 by $ 24. The record does not provide an explanation for this discrepancy.↩
8. While the record does not reflect that George Christian and Laura Christian executed a similar agreement to extend the time to assess tax liability for the taxable year 1982, these petitioners have not raised the argument that the statutory period of limitations had expired. Invoking a statute of limitations argument is an affirmative defense. Adler v. Commissioner, 85 T.C. 535, 540 (1985); Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 823↩ (1981).
9. The exhibit presented at trial did not have attached to it a form indicating ALC's intention to pass through the ITC to the lessee as was attached to the GS lease agreement exhibit. However, the form was attached to another exhibit presented at the trial.↩
10. The record does not, however, contain a copy of the distribution agreement.↩
11. It is apparent that the Form 1065 was not properly completed.↩
12. These petitioners' 1982 return does not contain a Schedule E.↩
13. These petitioners filed an amended return for 1982 which reflects a reduction in total income of $ 336. Respondent apparently agreed to this adjustment, as reflected in the notice of deficiency.↩
14. In the notices of deficiency, respondent raises several other arguments for disallowance of the claimed credits and deductions.↩
15. GS filed an original and amended partnership return on or before Apr. 15, 1983.↩
16. Sec. 601.105(j), Statement of Procedural Rules, provides in pertinent part that the IRS will not reopen any case closed after examination by a District Director or a Service Center to make an adjustment unfavorable to a taxpayer unless: (1) There is evidence of fraud, malfeasance, collusion, concealment, or misrepresentation of a material fact; (2) the prior closing involved a clearly defined substantial error based on an established IRS position existing at the time of the previous examination; or (3) other circumstances exist which indicate that failure to reopen would be a serious administrative omission.↩
18. George Christian, Jr., and Marion E. Christian gave no indication that the returns were filed at a later date.↩
19. George Christian, Jr., and Marion E. Christian do not fall within the provisions of sec. 6501(k) because the entire deficiency for 1979 and 1980 is attributable to the disallowance of the ITC carryback. See Suivski v. Commissioner, T.C. Memo. 1993-291↩.
19. The Tax Court has also applied a "generic tax shelter" test which applies much of the same analysis as that present in the two-pronged test. See, e.g., Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851↩ (6th Cir. 1989).
20. George Christian, Jr., claims he never received ALC's promotional material. We find petitioner's testimony not to be credible.↩
21. Petitioners failed to present any evidence to substantiate that such a survey was undertaken, other than their self-serving testimony which we do not need to accept without further supporting documentation. Tokarski v. Commissioner, 87 T.C. 74, 77↩ (1986).
22. Despite the indication in the promotional material that an investor could choose the services of any distributor, petitioners chose to use NEO, the distributor with a pre-existing relationship with ALC.↩
23. George Christian, Jr., and Marion E. Christian, after trial, filed a motion to exclude the testimony of respondent's expert witness with respect to the value of the Bob Marley master recording. Because we concluded that these petitioners failed to establish the fair market value of the recordings, we need not rely upon respondent's expert witness testimony and report. We deem these petitioners' motion moot. We also did not rely upon the testimony and report provided by respondent's expert concerning the "Guitar Greats" recording. The expert indicated that his appraisal was not based upon a commercially distributed copy of the master recording, and we, therefore, find the appraisal to be unreliable. However, George Christian and Laura Christian failed to present any reliable information pertaining to the "Guitar Greats" master recording's fair market value.↩
24. For the years 1979 and 1980, the addition to tax is imposed under sec. 6653(a).↩
25. Sec. 6659 applies to returns filed after Dec. 31, 1981. However, the deficiencies for the years prior to 1982 are attributable to a credit carryback which was generated in 1982. In Nielsen v. Commissioner, 87 T.C. 779 (1986), we held that an item carried back from a later year to an earlier year is "attributable to" the adjustments in the later year. See Soriano v. Commissioner, 90 T.C. 44, 61↩ (1988).
26. The notices of deficiency accurately reflect that the sec. 6659 addition to tax does not apply with respect to the portion of the underpayment attributable to the disallowance of the claimed deductions of the lease payments and the distribution costs. Soriano v. Commissioner, supra↩ at 62.
27. George Christian, Jr., and Marion E. Christian raised an argument about the use of the term "tax shelter", which we believe to be without merit.↩